

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| LILLIAN M. LEWELLEN, | ) | |
| | ) | |
| Appellant/Cross-Respondent, | ) | |
| | ) | |
| v. | ) | No.  SC92871 |
| | ) | |
| CHAD FRANKLIN and CHAD FRANKLIN | ) | |
| NATIONAL AUTO SALES NORTH, LLC, | ) | |
| | ) | |
| Respondents/Cross-Appellants. | ) | |

APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY
The Honorable Larry D. Harman, Judge

*Opinion issued September 9, 2014*

This appeal arises from an action brought by Lillian Lewellen against Chad Franklin and Chad Franklin National Auto Sales North, LLC (National), for fraudulent misrepresentation and unlawful merchandising practices under the Missouri Merchandising Practice Act (MMPA), section 407.010, *et seq*., RSMo.  A jury awarded Ms. Lewellen actual damages of $25,000 and punitive damages of $1 million against Mr. Franklin and National on both counts.  She took judgment against Mr. Franklin under her fraudulent misrepresentation claim and take judgment against National under the MMPA claim.  Pursuant to section 510.265,[1] the circuit court reduced the punitive damages awards against Mr. Franklin and National to $500,000 and $539,050,

---

[1] All statutory references are to RSMo Supp. 2013, unless otherwise indicated.

respectively. Ms. Lewellen appeals her punitive damages award against Mr. Franklin, claiming section 510.265 violates her rights to a jury trial, equal protection, and due process and violates the separation of powers doctrine. Mr. Franklin and National cross-appeal, claiming the circuit court abused its discretion by imposing discovery sanctions in a vague and ambiguous order and by overruling their motion to reduce the punitive damages awards as a violation of their due process rights. Because Ms. Lewellen challenges the validity of a statute, this Court has exclusive jurisdiction over this appeal. Mo. Const. art. V, sec. 3.

In accordance with *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 638 (Mo. banc 2012), this Court holds that the mandatory reduction of Ms. Lewellen's punitive damages award against Mr. Franklin under section 510.265 violates Ms. Lewellen's right to a trial by jury as guaranteed by article I, section 22(a) of the Missouri Constitution. This Court rejects Mr. Franklin and National's claims that the amount of the punitive damages awards violates their due process rights and that the circuit court abused its discretion in ordering discovery sanctions. Because there is no need for further proceedings in the circuit court, this Court may enter judgment as the circuit court ought to have entered to reflect the punitive damages award against Mr. Franklin assessed by the jury. Rule 84.14; *DeBaliviere Place Ass'n v. Veal*, 337 S.W.3d 670, 679 (Mo. banc 2011). Accordingly, this Court affirms the circuit court's judgment except for the portion reducing the punitive damages award assessed against Mr. Franklin pursuant to section 510.265. That portion of the judgment is vacated, and

this Court enters judgment awarding Ms. Lewellen $1 million in punitive damages against Mr. Franklin for fraudulent misrepresentation.

## Factual and Procedural Background

At all relevant times, Mr. Franklin was the owner of National, a motor vehicle dealership in Kansas City, Missouri. Mr. Franklin became frustrated by the low number of sales at National and at another dealership he owns. To bring more customers into the dealership, Mr. Franklin sought to use aggressive and creative print and television advertisements. Some of these advertisements promoted a program in which customers could purchase a vehicle for only $49, $69, or $89 per month.

When Ms. Lewellen, a 77-year old widow, needed a new vehicle after the transmission on her van went out, she visited National because she had seen several of National's advertisements for vehicles with a $49-per-month payment plan. Upon arriving at the dealership, Ms. Lewellen told one of National's employees that she was interested in the $49-per-month payment plan, and she picked out a 2002 Lincoln that qualified for the program.[2] Throughout her visit, Ms. Lewellen repeated that she could afford to pay only $49 per month for a vehicle.

A salesperson at National explained to Ms. Lewellen that the $49-a-month program was a five-year plan in which National would send her a check for the difference between her monthly payment and her $49-per-month obligation. At the end of each

---

[2] The lot was divided into sections for the $49-per-month vehicles, the $69-per-month vehicles, and the $89-per-month vehicles. The Lincoln Ms. Lewellen selected was located in a section of the lot specifically for the vehicles eligible for the $49-per-month program.

year, Ms. Lewellen would trade in her vehicle for a different vehicle for the same $49 monthly payment.[3] Ms. Lewellen agreed to buy the Lincoln through the $49-per-month program in part because she felt pressure by the salesman to purchase a vehicle during that visit.

The total sales price of the Lincoln was $19,940.45, including $2,500 for a service contract fee and $599 for gap insurance. The salesperson did not discuss these additional fees in the contract with Ms. Lewellen, nor was she aware of them. The contract also listed the trade-in value for Ms. Lewellen's van as $1,365. While the figure was in the contract, Ms. Lewellen was not otherwise made aware of that trade-in value. One of the documents presented to Ms. Lewellen by the employee stated, "No investment, $49 first six months."

Ms. Lewellen met with another National employee who helped her fill out a credit application, which required Ms. Lewellen to state her monthly income. The National employee wrote down Ms. Lewellen's monthly income as $920, which Ms. Lewellen testified was the correct income at that time. Another document labeled "Applicant's Credit Statement" was also filled out by a National employee, and this document listed Ms. Lewellen's monthly income as $18,000. Based on the information provided, Ms. Lewellen's monthly payment was $387.45. Like the salesman, this employee assured Ms. Lewellen that she would be obligated to pay only $49 per month.

---

[3] Ms. Lewellen was told that when she traded-in her Lincoln, she would have to pick a different vehicle because she could not have the same vehicle twice.

When Ms. Lewellen did not receive a check from National soon after the sale, she contacted National multiple times to inquire about payment. She eventually received a check from National for $3,287.30, which was intended to cover the difference between the monthly payment listed on Ms. Lewellen's credit application and $49 per month. Ms. Lewellen used that money and her own $49 to make the $387.45 payments to Harris Bank, the lender holding Ms. Lewellen's loan. The check from National, however, only covered the difference for nine months, and National never sent Ms. Lewellen another check for the remaining months. When the money from National was expended and Ms. Lewellen became unable to make her payments in full, she contacted Harris Bank to explain the situation and continued to make the $49 monthly payments. Harris Bank eventually repossessed Ms. Lewellen's vehicle and sued her for breach of contract. Ms. Lewellen continued to make $49 monthly payments for a while but later reduced her monthly payments to $25.

Ms. Lewellen filed a petition against Mr. Franklin and National for common law fraudulent misrepresentation and unlawful merchandising practices under the MMPA.[4] Prior to trial, Ms. Lewellen moved for an entry of sanctions against Mr. Franklin and National for Mr. Franklin's repeated failure to appear for depositions personally or as a representative of National. The circuit court sustained the motion, ordering that the pleadings of Mr. Franklin and National be struck and that any documents produced by Mr. Franklin or National through discovery could be admitted in evidence against them.

---

[4] Ms. Lewellen also named Harris Bank as a defendant in the action. Her claims against Harris Bank were severed and later dismissed by the parties.

The court stated it would provide further guidance as to how Mr. Franklin and National would be allowed to participate in the trial. At a subsequent pretrial conference, the court explained that its order striking the pleadings caused Mr. Franklin and National to be in default. They would be permitted to participate in voir dire "to the extent that an appropriate voir dire question had not been asked by any of the remaining non-sanctioned and not in default parties." Further, cross-examination of witnesses would be limited to the issue of damages.

At the trial, Ms. Lewellen testified about her dealings with National. She also presented testimony from two other persons who were similarly misled by employees of National or Mr. Franklin's other dealership after seeing the advertisements. Ms. Lewellen presented evidence of 73 complaints against National and Mr. Franklin's other dealership filed with the Missouri attorney general and numerous similar complaints filed with the Kansas attorney general. There was also evidence of National's print and television advertisements promoting the $49-per-month program and of Mr. Franklin's advertising strategy.

The jury awarded Ms. Lewellen $25,000 in actual damages for her fraudulent misrepresentation claims against Mr. Franklin and National and $25,000 in actual damages for her MMPA against Mr. Franklin and National.[5] It also found Mr. Franklin and National liable for punitive damages and awarded Ms. Lewellen $1 million in

---

[5] Only the issue of damages was submitted to the jury. Mr. Franklin's and National's liability on Ms. Lewellen's claims was not before the jury.

punitive damages for each claim.[6]  Ms. Lewellen elected to take judgment for actual and

punitive damages for fraudulent misrepresentation against Mr. Franklin and judgment for

actual and punitive damages for the MMPA violation against National.[7]  Having found

Ms. Lewellen's actual damages for her fraudulent misrepresentation claim are the same

as her actual damages for her MMPA claim, the circuit court ordered that Ms. Lewellen

would receive only $25,000 in actual damages, assessed jointly and severally against

Mr. Franklin and National.  Ms. Lewellen was also awarded $82,810 in attorneys' fees on

her MMPA claim against National.

The circuit court overruled Mr. Franklin and National's motion for a new trial for

the court's failure to provide adequate notice of the discovery sanctions.  It sustained

their motion to reduce the punitive damages awards pursuant to section 510.265, reducing

the punitive damages awards against Mr. Franklin and National to $500,000 and

$539,050, respectively.  In reducing the awards, the court rejected Mr. Franklin and

National's claim that the punitive damages awards violated their due process rights and

Ms. Lewellen's claims that the cap on punitive damages violates her rights to a trial by

---

[6] The trial was bifurcated.  In the first phase, the jury determined the amount of compensatory damages and whether Mr. Franklin and National were liable for punitive damages.  In the second phase, the jury determined the amount of punitive damages for which they were liable.

[7] Because Ms. Lewellen's claims for fraudulent misrepresentation and an MMPA violation are not inconsistent, both counts were submitted to the jury.  *See Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 142-43 (Mo. banc 2005).  Under the merger of damages doctrine, however, a plaintiff cannot recover more than one full recovery for the same harm.  *Trimble v. Pracna*, 167 S.W.3d 706, 711 (Mo. banc 2005).  Because the harm suffered by fraudulent misrepresentation was the same as the harm caused by the MMPA violation, Ms. Lewellen had to elect under what theory to take judgments against Mr. Franklin and National.

jury, due process, equal protection, and open courts, and violates the separation of powers doctrine and the prohibition against special legislation.

Ms. Lewellen, Mr. Franklin and National all appeal the circuit court's judgment. Ms. Lewellen asserts that reduction of punitive damages pursuant to section 510.265 violates her rights to a jury trial, equal protection, and due process and violates the separation of powers doctrine. In their cross-appeal, Mr. Franklin and National assert that the circuit court abused its discretion by imposing discovery sanctions in a vague and ambiguous order and by overruling their motion to further reduce the punitive damages awards as a violation of their due process rights.[8]

## Section 510.265 Violates Right to Trial by Jury

Ms. Lewellen claims her constitutional right to trial by jury was violated when the trial court applied section 510.265 to reduce the punitive damages the jury awarded on her fraudulent misrepresentation claim against Mr. Franklin.[9] Section 510.265 provides, "No award of punitive damages against any defendant shall exceed the greater of: (1) Five hundred thousand dollars; or (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant." Ms. Lewellen asserts that the application of this statute to her fraudulent misrepresentation claim divests the jury of its function in

---

[8] As Mr. Franklin and National's appeal does not involve issues reserved for the exclusive jurisdiction of this Court, it was filed originally in the court of appeals. This Court transferred the appeal to this Court pursuant to Rule 83.01.

[9] Ms. Lewellen does not challenge on appeal the application of section 510.265 to reduce her punitive damages award against National on her MMPA claim. Likely, she did not raise such a claim because this Court has already held that application of section 510.265 to statutory claims under the MMPA is constitutionally valid because MMPA claims did not exist in 1820. *See Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 375-81 (Mo. banc 2012).

determining damages and, thereby, deprives her of a right to a trial by jury guaranteed by article I, section 22(a) of the Missouri Constitution.

This Court reviews constitutional challenges *de novo*. *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 372 (Mo. banc 2012). A statute is presumed valid and will be declared unconstitutional only if the challenger proves the statute "clearly and undoubtedly violates the constitutional limitations." *Id*. As the challenger, Ms. Lewellen has the burden of proving section 510.265 is unconstitutional. *See id*.

In *Watts*, this Court held applying a similar statutory cap on noneconomic damages violated Missouri's constitutional right to a jury trial. 376 S.W.3d at 638. Though *Watts* struck down a cap on noneconomic damages in a medical negligence case, it is controlling on the issue of whether application of the statutory cap on punitive damages in section 510.265 in a cause of action that existed in 1820 violates the right to a jury trial. As noted in *Watts*, the phrase "shall remain inviolate" in article I, section 22(a) means that any change in the right to a jury determination of damages as it existed in 1820 is unconstitutional. *Id.* at 638. The Court in *Watts* recognized that, in 1820, the jury determined the amount of damages at common law and there were no legislative limits on damages. *Id.* at 639-40. The Court, therefore, concluded that application of a statutory cap to damages awarded by a jury in a cause of action that existed in 1820 "necessarily changes and impairs the right of a trial by jury 'as heretofore enjoyed.'" *Id.* at 640.

As in *Watts*, there existed a right to a jury determination of the amount of punitive damages in a fraud cause of action in 1820. Actions for fraud in which only damages were sought were tried by juries in 1820.[10]  *See State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 85-87 (Mo. banc 2003). Additionally, determination of the amount of punitive damages was a function for the jury in 1820. Punitive damages were recognized in 1820 as a way to punish the guilty and deter future misconduct. *See Amiable Nancy*, 16 U.S. 546, 558 (1818); *see also Barry v. Edmunds*, 116 U.S. 550, 562-63 (1886); *Lake Shore & M.S. Ry. Co. v. Prentice*, 147 U.S. 101, 106-07 (1893). Under the common law as it existed at the time the Missouri Constitution was adopted, imposing punitive damages was a peculiar function of the jury. *Day v. Woodworth*, 54 U.S. 363, 371 (1851) (noting that assessing damages by way of punishment "has been always left to the discretion of the jury"); *Churchill v. Watson*, 5 Day 140, 144 (Con. 1811); *Carey v. Robbins*, 2 Del. Cas. 24, 26 (Del. 1808); *see also Overbey*, 361 S.W.3d at 375; *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 142 (Mo. banc 2005); *Goetz v. Ambs*, 27 Mo. 28, 33-34 (1858); *Walker v. Borland*, 21 Mo. 289, 291-92 (1855).

In *Blue Springs Ford*, this Court held that a claimant seeking damages on a claim brought pursuant to the Missouri Human Rights Act had a right to have a jury determine

---

[10] Fraud does not appear as a separate cause of action in Missouri cases until the mid-nineteenth century. *See Rutherford v. Williams*, 42 Mo. 18, 24-25 (1867). Nonetheless, "Missouri's common law is based on the common law of England as of 1607." *Watts*, 376 S.W.3d at 638; *see* section 1.010. Fraud claims were historically encompassed in trespass claims, as English common law recognized actions for trespass as a means to recover for deceit. The Forms of Action at Common-Law, A Course of Lectures by F.W. Maitland (Cambridge Univ. Press 1936), Lecture VI. *See also* BLACK'S LAW DICTIONARY 1643 (9th ed. 2009).

punitive damages. 176 S.W.3d at 142. The guarantee of a jury trial in the Missouri Constitution was violated by a statute providing for punitive damages but precluding a jury from determining punitive damages. *Id.* The Court, again, in *Overbey*, iterated its holding in *Blue Springs Ford* that there is a right to a jury trial on punitive damages. 361 S.W.3d at 375. [11]

Therefore, under *Watts, Blue Springs Ford*, and *Overbey,* the punitive damages cap imposed by section 510.265 "necessarily changes and impairs the right of a trial by jury 'as heretofore enjoyed.'" *Watts*, 376 S.W.3d at 640. Because section 510.265 changes the right to a jury determination of punitive damages as it existed in 1820, it unconstitutionally infringes on Ms. Lewellen's right to a trial by jury protected by article I, section 22(a) of the Missouri Constitution.

Mr. Franklin seeks to distinguish this case from *Watts* because, unlike noneconomic damages, punitive damages are subject to due process limitations. The Supreme Court has ruled that due process rights guaranteed by the United States Constitution "prohibit[] the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Cambell*, 538 U.S. 408, 409 (2003). Courts must review punitive damages awards and consider the reprehensibility of the defendant's misconduct, the disparity between the harm and the award, and the difference

---

[11] In *Overbey*, the Court held that application of the punitive damages cap in section 510.265 to an award for an MMPA claim did not violate the right to a jury trial because an MMPA claim did not exist in 1820. *Id*. at 376. Because the legislature created a cause of action under the MMPA, the legislature could establish the substance of an MMPA claim, including the maximum amount of punitive damages available for recovery. *Id*.

between the award and civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).[12] Courts may reduce the award accordingly if it violates the defendant's due process rights. *Id.* Mr. Franklin contends that, because punitive damages are already subject to legal limits under the Due Process Clause, the legislature may also impose legal limits on them through a statutory cap.

The limitations under section 510.265 are not of the same species as those required by the Due Process Clause of the United States Constitution. The Supreme Court has explicitly refused to establish a bright-line ratio that a punitive damages award cannot exceed due to the Supreme Court's reluctance to recognize concrete limits imposed by due process. *State Farm*, 538 U.S. at 425. Instead, "[t]he precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* In contrast, section 510.265 is not based on the facts or circumstances of a case; it caps the punitive damages award at $500,000 or five times the judgment amount regardless of the facts and circumstances of the particular case.

Due process requires a court to review a punitive damages award under the considerations articulated by the Supreme Court to prevent grossly excessive or arbitrary awards. *State Farm*, 538 U.S. at 417. Section 510.265 is not a codification of due process.[13] Like section 538.210 in *Watts*, section 510.265 "operates wholly independent

---

[12] Because Mr. Franklin and National challenge the punitive damages awards as violations of their due process rights, a more thorough examination of these considerations is provided *infra*.

[13] Merely because an award is within the bounds of section 510.265 does not relieve a court from its duty to review it in light of the particular facts of the case when a party

of the facts of the case." *Watts*, 376 S.W.3d at 640. Accordingly, this Court's holding that section 510.265 violates Missouri's right to a trial by jury does not imply that a right conferred by the Missouri Constitution overrides the United States Constitution[14] and does not discharge courts from their duty to review a punitive damages award under the Due Process Clause.

Rather, bound by *Watts*, this Court holds that the punitive damages cap in section 510.265 "curtails the jury's determination of damages and, as a result, necessarily infringes on the right to a trial by jury when applied to a cause of action to which the right to jury trial attaches at common law." *Id*. at 640. Because a party seeking punitive damages for fraud in 1820 would have had the right to have a jury try the issue of punitive damages, the statutory reduction of Ms. Lewellen's punitive damages award against Mr. Franklin pursuant to section 510.265 was unconstitutional.

Ms. Lewellen also challenges the punitive damages cap as violating her rights to due process and equal protection and as violating the doctrine of separation of powers. Because this Court finds section 510.265 violates the right to a jury trial, it does not address Ms. Lewellen's other constitutional challenges.

### Awards Do Not Violate Due Process

In their cross-appeal, Mr. Franklin and National assert that the circuit court erred by overruling their motion to reduce Ms. Lewellen's punitive damages awards because

---

claims the award violates due process. *See Overbey*, 361 S.W.3d at 372-74; *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 212-14 (Mo. App. 2013).

[14] Such a conclusion would contravene the supremacy clause of the United States Constitution. *See* U.S. Const. art. VI, cl. 2.

the amount of the award violated their due process rights under the Fourteenth Amendment of the United States Constitution and article I, section 10 of the Missouri Constitution. They argue that both the amount of punitive damages assessed by the jury and the reduced amount in the circuit court's judgment were grossly excessive. Because this Court holds that the circuit court could not constitutionally apply the damages cap to Ms. Lewellen's award against Mr. Franklin, it will consider whether the amount of punitive damages awarded by the jury violates Mr. Franklin's right to due process and whether the amount of punitive damages awarded after application of section 510.265 violates National's right to due process. Like Ms. Lewellen's constitutional challenge, this Court reviews Mr. Franklin and National's due process claim *de novo*. *Overbey*, 361 S.W.3d at 372; *see also State Farm*, 538 U.S. at 418.

The constitutions of the United States and Missouri guarantee that no person will be deprived of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, section 1; Mo. Const. art. I, sec. 10. This due process guarantee "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 409. "Elementary notions of fairness enshrined in . . . constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574-75 (internal citations omitted). In determining if a punitive damages award comports with due process, courts consider three guideposts: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the harm

and the punitive damages award; and (3) the difference between the punitive damages award and penalties authorized or imposed in comparable cases. *Id.*

The reprehensibility of the conduct is the most important factor and includes consideration of whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419.

The Supreme Court has recognized that "trickery and deceit are more reprehensible than negligence" and that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." *Gore*, 517 U.S. at 576 (internal citations omitted).

While the harm in this case was economic and there was no threat to the health or safety of others, Mr. Franklin's and National's conduct was nonetheless reprehensible. The persons targeted by the $49-per-month vehicles are financially vulnerable, low-income persons. Ms. Lewellen was one such financially vulnerable person; she was an unemployed, 77-year old widow whose only source of income was $920 of social security benefits per month. Additionally, Mr. Franklin and National engaged in trickery, malice or deceit by using deceptive and misleading advertisements. They lured in customers like Ms. Lewellen with frequently aired advertisements promising customers that they could purchase cars for only $49 per month but had them sign documents obligating them to pay larger monthly sums. For example, Ms. Lewellen was ultimately

contractually obligated to pay $379 per month, or $4,548 annually. National employees repeatedly assured Ms. Lewellen that she would have to pay only $49 per month, or $588 annually, for five years and that National would send her a check to cover the difference in her car payments. Contrary to their representations, National employees had Ms. Lewellen sign a document that stated "$49 first six months." And National only sent a check sufficient to cover the difference for nine months, leaving Ms. Lewellen contractually obligated to make car payments she could not afford.

Mr. Franklin and National repeatedly engaged in this deceitful conduct. Two witnesses testified that Mr. Franklin and National made misrepresentations to them similar to those made to Ms. Lewellen. Evidence was also presented showing that hundreds of complaints from other customers of National or Mr. Franklin's other dealership have been filed with either the Kansas or Missouri attorney general with regard to deceptive promotional programs and advertisements.

Mr. Franklin and National contend that the repeated conduct factor for reprehensibility is limited to similar *prior* conduct and that there was no proof these customer complaints occurred prior to Ms. Lewellen's dealings with National. In discussing the constitutional parameters of punitive damages, the United States Supreme Court has stressed that "courts must ensure the conduct in question replicates the prior transgressions." *State Farm*, 538 U.S. at 423. The emphasis on prior transgressions, however, was in recognition that "repeated misconduct is more reprehensible than an individual instance of malfeasance." *Id*. Therefore, this Court finds that any sufficiently similar misconduct, regardless of when it occurred, is relevant in assessing the

reprehensibility of a defendant's conduct. Mr. Franklin's and National's repetitive use of intentionally deceptive business practices targeting financially vulnerable persons weighs in favor of a higher punitive damages award.

Turning to the second guidepost, this Court must consider the disparity between the actual damages and the punitive damages awarded. Ms. Lewellen suffered damages from the repossession of her Lincoln, the damage to her good credit record after her unpaid account with Harris Bank was turned over to a collection agency, the suit brought by Harris Bank for defaulting on her loan, the stress of being unable to make her loan payments, and Ms. Lewellen's fear that she would go to jail. The jury awarded actual damages in the amount of $25,000 against both Mr. Franklin and National. It awarded punitive damages against Mr. Franklin for $1 million, creating a 40:1 ratio between punitive damages to actual damages. The final punitive damages award against National was $539,050, which yields a 22:1 ratio.[15]

While "few awards exceeding a single digit ratio between punitive damages and compensatory damages . . . will satisfy due process," greater ratios may "comport with due process where 'a particularly egregious act has resulted in only a small amount of

---

[15] Ms. Lewellen claims the amount of actual damages assessed against National is $107,810, which includes attorneys' fees, and, therefore, the ratio is 5:1. Attorneys' fees are a part of the "net judgment" used to calculate punitive damages under section 510.265. *Hervey v. Missouri Dept. of Corr.*, 379 S.W.3d 156, 164 (Mo. banc 2012). But in setting out the guideposts, the United States Supreme Court considered only compensatory damages. *See State Farm*, 538 U.S. at 424-427. Because compensatory damages are limited to the plaintiff's loss, the ratio does not include attorneys' fees. *See Firestone v. Crown Ctr. Redevelopment Corp.*, 693 S.W.2d 99, 103 (Mo. banc 1985), *superseded by statute on other grounds as recognized in Badahman v. Catering St. Louis*, 395 S.W.3d 29, 36 (Mo. banc 2013).

economic damages.'" *Id.* at 425. The double-digit ratios between punitive damages and compensatory damages are warranted in this case. Mr. Franklin's and National's conduct was particularly egregious. Mr. Franklin, believing he was not receiving his "share of the pie," sought to create creative and aggressive advertisements to bring in business. One advertising campaign targeted financially vulnerable consumers by promising monthly payments as low as $49, $69, or $89 a month. Once customers were legally bound to pay an amount several times greater than the advertised amount,[16] National would fail to live up to its promise. National's actions left customers without their trade-in vehicles and with bills they could not afford to pay, leading to repossession of the new vehicles, suits for default on the loans, and bad credit. This type of bait-and-switch practice was not limited to Ms. Lewellen's purchase but was employed repeatedly.[17] Further, Mr. Franklin has showed no remorse or effort to rectify the consequences of his unlawful practices. Even in the instant action, Mr. Franklin refused to respond to discovery requests, resulting in sanctions.

Mr. Franklin and National argue that this case does not fall within the variety warranting larger ratios because $25,000, the amount of compensatory damages awarded, is not a "small amount." The amount of actual damages in this case is not so large as to make a double-digit ratio "grossly excessive." It is certainly a small amount when

---

[16] In Ms. Lewellen's case, her monthly obligation of $387.45 was almost eight times the $49 she was assured that she would have to pay.

[17] The widespread use of this bait-and-switch practice is evidence that the conduct posed a greater risk to the public and was more reprehensible. But the reasonableness of the punitive damages awards in this case is determined only by the harm to Ms. Lewellen and should not reflect punishment for harming others. *See Phillip Morris USA v. Williams*, 549 U.S. 346, 354-55 (2007).

compared to the $2.6 million actual damages award that caused concern in *State Farm*. *See* 538 U.S. at 416. And $25,000 is not much larger than some of the actual damages awards used by courts to justify higher ratios. *See TXO Prod. Corp v. Alliance Res. Corp.*, 509 U.S. 443, 461 (1993) (526:1 ratio with $19,000 in actual damages); *Krysa v. Payne*, 176 S.W.3d 150, 160-162 (Mo. App. 2005) (27:1 ratio with $18,449 in actual damages). Further, much higher ratios than the ones in this case have been found to comport with due process. *See Overbey*, 361 S.W.3d at 374 (affirming award yielding 111:1 ratio); *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, (Mo. App. 2001) (finding a ratio of 66:1 was not excessive). Considering the particularly egregious conduct and the relatively small amount of compensatory damages, ratios of 22:1 and 40:1 do not make the punitive damages awards in this case grossly excessive. "A jury would be within its discretion in determining that, in these circumstances, in which 'a particularly egregious act has resulted in only a small amount of economic damages,' the usual single-digit ratio may not be an appropriate measure of the limits of due process." *See Overbey*, 361 S.W.3d at 374.

The third guidepost is the disparity between the punitive damage and "the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575. Comparable civil penalties that could arise from Mr. Franklin's and National's conduct are delineated in the MMPA. The MMPA permits courts "to award the state a civil penalty of not more than one thousand dollars per [MMPA] violation," section 407.100.6, and $5,000 for any violation of an injunction, restitution order or judgment issued

pursuant to the MMPA, section 407.110. There is no doubt that the punitive damages awards in this case are larger than the penalties authorized under the MMPA.

Nonetheless, this Court considers all three guideposts, and the punitive damages awards assessed against Mr. Franklin and National are not grossly excessive considering their intentional and flagrant trickery and deceit employed to target a financially vulnerable person causing her to lose her means of transportation, subject her to suit, and damage her credit. The circuit court, therefore, did not err in overruling Mr. Franklin and National's motion to reduce punitive damages on the grounds that the awards violated their due process rights.

## Discovery Sanctions

Mr. Franklin and National also challenge the circuit court's ruling on Ms. Lewellen's motion for discovery sanctions. They assert the court failed to provide adequate notice of its sanctions because the order was ambiguous as to the restrictions on their ability to present evidence, make objections, and present arguments at trial.[18] Mr. Franklin and National argue that this ambiguity made it impossible for counsel to adequately prepare for trial, thereby prejudicing them.

A circuit court has broad discretion in determining the admission of evidence and imposing sanctions for discovery violations. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 819 (Mo. banc 2000). Its decision will not be overruled unless there is an abuse of discretion. *Id.* An abuse of discretion occurs "when the trial court's ruling is

---

[18] Mr. Franklin and National do not challenge the imposition of sanctions but rather the vagueness of the sanctions imposed.

clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* Even if there is an error, this Court will not reverse a judgment unless the erroneous sanction resulted in prejudice. *See id.*

After failing to appear for depositions twice,[19] Ms. Lewellen filed a motion to sanction Mr. Franklin and National. After a hearing on the motion, the court ordered Mr. Franklin's and National's pleadings be struck and precluded them from introducing evidence regarding the issue of liability. Additionally, the court ordered that any documents produced by Mr. Franklin and National as a result of discovery could be admitted only as evidence against them. Specifically, the circuit court stated:

> This court does find that Chad Franklin, and as the representative, corporate representative of Chad Franklin National Auto Sales, has intentionally violated the rules of discovery, has intentionally violated the court order to appear for depositions, that that [sic] has caused prejudice to [Ms. Lewellen] . . . that the conduct is willful . . .. Therefore, [Ms. Lewellen's] motion for sanctions is granted.

> The pleadings of defendant, Chad Franklin, and defendant, Chad Franklin National Auto Sales, are struck. Those two defendants will be precluded from introducing evidence in defense of the claims. Any documents that had been produced as a result of the discovery process by those two defendants, if offered by [Ms. Lewellen], can be admitted for purposes against defendants Franklin, the Franklin defendants only.

When counsel for Mr. Franklin and National requested clarification about whether counsel would be precluded from cross-examining witnesses at trial, the court responded

---

[19] After the first time Mr. Franklin failed to appear, the circuit court ordered him and a representative of National to appear at the next deposition. Despite this order, neither Mr. Franklin nor a representative of National appeared. The court also appointed a discovery master to the case due to other discovery issues.

that the court would get back to counsel after considering the matter further. At a later pretrial hearing, the court limited Mr. Franklin's and National's participation in voir dire and ability to cross-examine witnesses, stating:

> My rulings with respect to defendants Franklin, or the dealer defendants, hasn't changed. And it's almost as if they're in default. The pleadings have been struck. I'm allowing participation in the voir dire to the extent that an appropriate voir dire question has not been asked by any of the remaining non-sanctioned and not in default parties, including [Ms. Lewellen], of course, and will allow cross-examination only on the issue of damages.

The circuit court's order of sanctions in this case was not vague or ambiguous because it specifically informed counsel what counsel could and could not do. In striking Mr. Franklin's and National's pleadings and precluding them from defending against Ms. Lewellen's claims, the court, in effect, found Mr. Franklin and National liable. Additionally, the court was clear that documents produced by Mr. Franklin and National during discovery could be admitted only as evidence against them. Further, their counsel's participation in voir dire was limited to asking appropriate questions not otherwise asked, and counsel could cross-examine witnesses only on the issue of damages.

Even though the court's order did not address specifically whether Mr. Franklin and National could object to evidence, later statements by the court at the pretrial conference made clear that they would be allowed to make objections to improper evidence. In ruling on motions in limine brought by Mr. Franklin and National, the court declined to exclude certain evidence from the outset but repeatedly informed counsel for Mr. Franklin and National to "be on [counsel's] toes with an objection" and that the court

would be watching for those objections. After these statements, there was no doubt that counsel would be allowed to object to any improper evidence offered by Ms. Lewellen.

Aside from making broad statements that their counsel could not adequately prepare for trial, Mr. Franklin and National fail to show how they were prejudiced by the purported lack of clarity in the circuit court's order. They do not specify what counsel would have done differently at trial or to prepare for trial if the order were clearer. Moreover, Mr. Franklin and National could not have been prejudiced by the trial court's initial failure to specify whether counsel could object to evidence because the record shows counsel made multiple objections to evidence offered by Ms. Lewellen. They also could not have been prejudiced by the failure to specify whether counsel could make arguments to the jury regarding issues raised by Ms. Lewellen because counsel's closing argument referred to evidence Ms. Lewellen presented.

Mr. Franklin and National fail to demonstrate how the circuit court's order was vague or how it prejudiced them. Therefore, the circuit court did not abuse its discretion when it imposed discovery sanctions.

## Conclusion

Because the right to a jury trial in 1820 included the right to have a jury determine the amount of punitive damages in an action for fraud, section 510.265's cap on punitive damages awards is unconstitutional because the statute imposes a legislative limit on the jury's assessment of punitive damages when such limits did not exist in 1820. The circuit court erred by reducing Ms. Lewellen's punitive damages award against Mr. Franklin pursuant to the caps in section 510.265. The circuit court did not err, however, in

overruling Mr. Franklin and National's motion to reduce the punitive damages awards as a matter of due process because the punitive damages awards were not grossly excessive. Lastly, the circuit court's order imposing discovery sanctions against Mr. Franklin and National was not ambiguous, and Mr. Franklin and National failed to show any resulting prejudice. Accordingly, this Court affirms the circuit court's judgment in all respects except for the portion applying section 510.265 to the punitive damages award assessed against Mr. Franklin for fraudulent misrepresentation. That portion of the judgment is vacated, and this Court enters judgment awarding Ms. Lewellen $1 million in punitive damages against Mr. Franklin.

_____
PATRICIA BRECKENRIDGE, JUDGE

All concur.