

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| DIANA LYNN HECKADON, PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID HECKADON, DECEASED, AND DIANA LYNN HECKADON, | WD81181 WD81251 WD81259 WD81290 WD81297 |
| Appellant-Respondents, | |
| v. | OPINION FILED: |
| UNIVERSAL UNDERWRITERS INS. CO., ET AL.; | June 4, 2019 |
| Respondent-Appellants, | |
| CHAD FRANKLIN; CHAD FRANKLIN NATIONAL AUTO SALES NORTH, LLC; AND CFS ENTERPRISES, INC., | |
| Respondent-Appellants. | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Timothy Jon Flook, Judge**

**Before Division One:**
**Lisa White Hardwick, P. J., Edward R. Ardini, and Thomas N. Chapman, JJ.**

This appeal and cross-appeal are taken from a judgment in a case wherein David and

Diana Heckadon ("Heckadons") sought to recover against Universal Underwriters Insurance

Company ("Universal")[1] and Chad Franklin ("Chad"),[2] CFS Enterprises ("CFS"), and Chad Franklin National Auto Sales North ("NAS") (collectively "Franklin"), on a variety of theories alleging wrongdoing in failing to pay an earlier judgment the Heckadons had secured against Chad and CFS. The earlier judgment was secured after the Heckadons purchased a vehicle from Chad and CFS, pursuant to their "Drive for Life" program, then filed a lawsuit alleging fraudulent misrepresentation and violation of the Missouri Merchandising Practice Act (MMPA), section 407.010, *et seq.*, RSMo. (hereinafter "Original MMPA Action"). The Original MMPA Action resulted in the Heckadons receiving a judgment totaling $616,534.87.[3] Universal was separately sued by Chad, NAS and Tiffany Franklin ("Tiffany") after Universal denied coverage of the Heckadons' Original MMPA Action, and settled that suit for $900,000, none of which was paid to the Heckadons.

In 2012 the Heckadons brought the instant action against Universal, Chad, CFS, NAS, and Tiffany.[4] The judgment from which this appeal and cross-appeal are taken found in favor of

---

[1] Universal is a wholly owned subsidiary of Defendant Zurich American Insurance Company. For the sake of simplicity they will be referred to collectively as "Universal."

[2] In order to reduce confusion between Chad Franklin, Tiffany Franklin, and the various corporate entities bearing their surname, we will refer to Chad Franklin as "Chad" and Tiffany Franklin as "Tiffany." No familiarity or disrespect is intended.

[3] The original MMPA Action judgment included an award of $2,144.87 in actual damages against Chad and CFS, $100,000 in punitive damages against CFS, $400,000 in punitive damages against Chad, and prejudgment attorney fees of $114,390, in the total sum of $616,534.87. The Forth Amended Findings of Fact and Conclusions of Law and Partial Judgment entered in the instant action set out a total judgment against Universal on the equitable garnishment action in the amount of $647,421.39. Universal not only challenges its obligation to indemnify the original MMPA Action judgment in its cross appeal, but also challenges the amount of the equitable garnishment judgment. Because we reverse the equitable garnishment judgment in its entirety, we need not address the amount of the equitable garnishment judgment entered by the trial court.

[4] In their Amended Petition, the Heckadons eventually alleged eight counts against Franklin and Universal: Count I, Equitable Garnishment (against Universal); Count II, Declaratory Judgment (against Universal); Count III, Fraudulent Transfer (against Universal and Franklin); Count IV, Unlawful Merchandising Practice - MMPA (against Universal and Franklin); Count V, Civil Conspiracy (against Universal and Franklin); Count VI, Joint Venture/Joint

2

the Heckadons and against Universal and Franklin on some, but not all of the Heckadons' claims. Because both Universal and Franklin cross appeal we will refrain from referring to the parties as Appellant and Respondent and will instead (when referring to them in their capacity as litigants) use the terms from the trial court, i.e., Plaintiffs and Defendants. Given the number of issues in this appeal, we begin by summarizing the conclusions reached with respect to each issue.

## SUMMARY OF CONCLUSIONS

### Equitable Garnishment Bench Trial

The Heckadons asserted claims for equitable garnishment and declaratory judgment against Universal, seeking to determine Universal's obligations to indemnify the Original MMPA Action judgment. After a bench trial, the trial court determined that coverage applied and entered judgment against Universal in the sum of $647,421.39 (the amount of the Original MMPA Action judgment). In Points 1, 2, and 3 of its cross appeal, Universal argues that the court misapplied the law in construing the insurance policy and finding coverage. We find that Franklin's conduct which was the basis for the Original MMPA Action judgment was not a covered occurrence under the Universal policy. Point 2 of Universal's cross appeal is granted. The equitable garnishment judgment entered against Universal is reversed.[5]

### Summary Judgment In Favor of Universal Regarding Settlement of Bad Faith Claims

The Heckadons made additional claims contending that the settlement among Universal, Franklin, and Tiffany resulted in a distribution of settlement proceeds that was in fraud of their

---

Enterprise (against Universal and Franklin); Count VII, Bill in Equity (against Universal and Franklin); and Count VIII, Tortious Interference with a Business Expectation (against Universal). Tiffany was initially named in the lawsuit on the same counts alleged against Franklin but was dismissed as a party on the eve of trial.

[5] Our disposition of Point 2 makes it unnecessary that we address Points 1 and 3 of Universal's cross appeal.

3

rights. The trial court granted Universal's motion for summary judgment, finding that it was not liable for the Heckadons' claims relating to its distribution of the bad faith settlement proceeds. In Points 3, 4, and 5 of their appeal, the Heckadons claim that the trial court erred in granting summary judgment on these claims. We affirm the Summary Judgment in favor of Universal.

### Jury Trial Regarding Franklin's Settlement of Bad Faith Claims

Due to discovery violations by Franklin, the trial court sanctioned Franklin by striking its pleadings and entering an interlocutory default judgment finding Franklin liable for its distribution of the bad faith settlement proceeds. A jury trial was conducted to determine the damages to be assessed on the fraudulent transfer and MMPA claims against Franklin. The jury awarded the Heckadons $647,334 in actual damages on the fraudulent transfer claims against Franklin, and punitive damages of $500,000 against Chad, $500,000 punitive damages against NAS, and $500,000 punitive damages against CFS.[6] Franklin filed a post-trial Motion to Amend the Judgment, asserting that the amount paid to its attorney in the underlying bad faith claim was subject to a valid lien and not eligible for consideration as potential damages related to the fraudulent transfer claim. Finding that it erred in holding that § 484.130 did not establish a valid attorney fee lien, the trial court sustained the motion and reduced the award of actual damages against Franklin by the amount paid to Mayer, resulting in an award of $266,370.41.

In Point 1 of their appeal, the Heckadons maintain that the trial court did not have the authority to amend the judgment more than 30 days after the judgment was entered. In Point 2 they contend that this reduction (by the amount of the attorney fee lien) improperly substituted the court's verdict for the jury's verdict in the assessment of actual damages. We find that the

---

[6] The jury awarded no damages on the Heckadons' MMPA claims against Franklin.

court had the authority to *properly* amend the judgment more than 30 days after it was entered, but that its amendment reducing the actual damages by the amount of the attorney's fee was improper. Point 1 of the Heckadons' appeal is denied. Point 2 of the Heckadons' appeal is granted in part.

Franklin cross appeals, asserting (in Point 1) that the trial court erred in striking its pleadings and entering default judgment on the issue of liability; asserting (in Point 2) that the trial court erred in submitting a modified instruction which failed to require the jury to make the findings (of outrageous conduct or reckless disregard) necessary to impose punitive damages; asserting instructional error (in Point 3) regarding the verdict form; and asserting (in Point 4) that the trial court erred in refusing to allow its attorney to testify regarding the reasons for allocation and distribution of the bad faith settlement proceeds. We find that the trial court did not err in striking Franklin's pleadings, and, therefore, deny Point 1 of Franklin's cross appeal. We find that the trial court erred in excluding testimony explaining the bad faith settlement, and, therefore, grant point 4 of Franklin's cross appeal. Since the effect of the trial court's evidentiary errors materially affected the merits and outcome of the proceeding, the judgment for actual and punitive damages against Franklin is reversed and remanded for proceedings consistent with this opinion. Given our disposition of Point 4, we find it unnecessary to address the claims of instructional error raised in Points 2 and 3 of Franklin's cross appeal.

## ANALYSIS

### Facts and Procedure

In September 2007, the Heckadons purchased a car from Chad and CFS under the "Drive for Life" promotion.[7] To participate in this promotion the Heckadons signed documents obligating them to a high interest loan to purchase the car, with Franklin agreeing to send them sufficient funds on a monthly basis to reduce their effective payment to only $49 a month. Unbeknownst to them at the time, the amount bundled into the loan included a charge for a $499.95 membership fee for participation in "Drive for Life," gap insurance, and an extended warranty for a car they were (under the terms of the promotion) to own for only one year. In 2008 the Heckadons traded in their first vehicle and selected a second. They were again charged a $499.95 membership fee for participation in "Drive for Life," a separate charge for gap insurance, and a separate charge for another extended warranty fee. While the sticker price of the vehicle was $17,495, the price they were charged was $19,495. Approximately ten months after they began participating in the program (sometime in the middle of 2008) Franklin stopped providing its share of the payments and the Heckadons then discovered that they were obligated for the full loan amount and monthly payments of $649.37 per month.

In December of 2009, the Heckadons filed the Original MMPA Action against Chad and CFS, alleging violation of the MMPA. In May 2011, a jury awarded the Heckadons

---

[7] The promotional program advertised car payments as low as $43 a month. As it was explained to the Heckadons, customers who enrolled in the program (which was to last up to four years) could purchase a Suzuki vehicle, drive it for a year, return the vehicle to Franklin, and select a new Suzuki vehicle. The cost to the Heckadons would remain the promotional price. Franklin explained that they were offering the promotional program in order to ensure that Franklin had low-mileage vehicles to sell on their used car lot.

$647,421.39, including actual damages, punitive damages, and attorney's fees on their MMPA claim.

Meanwhile, in October of 2008, Franklin initiated a bad faith lawsuit against Universal, eventually adding Tiffany Franklin, the wife of Chad Franklin, as a plaintiff. The bad faith lawsuit settled for $900,000 on August 31, 2010. The settlement agreement provided that $250,000 would go to Fifth Third Bank, a creditor; $383,629.59 to Monsees, Miller, Mayer, Presley & Amick (the attorneys who prosecuted the bad faith lawsuit for Franklin hereinafter referred to as "Mayer"); and $266,370.41 to Tiffany Franklin.

In April 2012, the Heckadons filed their petition in the instant action. In February of 2016, after repeated failures to compel Chad to appear at depositions, a hearing was held on the Heckadons' motion for sanctions. At that hearing, the trial court ordered Chad to appear at the next deposition in both his individual capacity and as the representative of the named entities. Chad again failed to appear at the properly noticed date. At a hearing on March 29, 2016, on the Heckadons' renewed motion for sanctions, Chad's counsel argued that his failure to appear was excusable, because he had entered an out of state drug rehabilitation program and was unreachable by counsel. Noting that Chad had been aware of the ongoing litigation when he entered the program, that he had failed to inform his counsel prior to doing so, and that he had engaged in a pattern of obstruction, the trial court struck the pleadings of Franklin, and entered a default judgment with respect to liability against Franklin on Count III (Fraudulent Transfer); Count IV (Unlawful Merchandising Practice – MMPA); Count V (Civil Conspiracy); and Count VI (Joint Venture/Joint Enterprise).

By agreement of the parties, a bench trial was held on the equitable garnishment and declaratory judgment counts that addressed Universal's obligation to indemnify the Original MMPA Action judgment. Following that bench trial, the trial court entered judgment against Universal, finding the policy language ambiguous (regarding coverage of intentional acts), construing those ambiguities in favor of coverage, and finding that coverage applied because the policy provided that it would pay damages in "amounts awardable by a court of law."

On March 30, 2017, the trial court granted a motion for summary judgment filed by Universal, finding that, as a matter of law, Universal was not liable on the Heckadons' claims related to distribution of the bad faith settlement proceeds.

A jury trial was held on the issue of damages to be assessed against Franklin on the Heckadons' MMPA and Fraudulent Transfer Claims related to the disposition of the bad faith settlement funds. While the Heckadons stipulated that the $250,000 payment to Fifth Third bank was a lien and clearly proper under Missouri's Uniform Fraudulent Transfer Act (hereinafter "MUFTA"), they maintained that the payments made to Mayer and Tiffany were improper. At trial, Mayer was permitted to testify that his firm represented Chad and Tiffany in a lawsuit against Universal and that Mayer received attorney's fees from the settlement amount. However, the trial court sustained objections to documents supporting Mayer's assertion that his firm possessed a valid lien, and, in the absence of those documents, Mayer was not permitted to testify that his firm complied with the statutory requirements for a lien under MUFTA.

The jury awarded $647,334 in actual damages against Franklin, and punitive damages of $500,000 each against Chad, NAS, and CFS for a total judgment (not including the Heckadons'

8

attorney's fees) of $2,147,334 on the Heckadons' fraudulent transfer claim.[8]  Final judgment was entered on July 24, 2017.  On July 28, 2017, the Heckadons moved the trial court to amend the judgment to include their attorney's fees.  On August 21, 2017, Franklin filed a motion requesting that the trial court reduce the award of actual damages by the amount of the attorney's fees paid to Mayer to pursue the bad faith claims against Universal ($383,629.59).  On August 23, 2017, Franklin filed a motion for new trial, alleging, among other things, that the trial court erred in refusing to allow Mayer to testify regarding his attorney fee lien and the reasons why distributions were made to Mayer and Tiffany in the bad faith claims settlement.  On October 24, 2017, the trial court entered an amended judgment reducing the actual damages awarded to the Heckadons by the amount of Mayer's attorney's fees, awarding the Heckadons their own attorney's fees, and denying the motion for new trial and all other post-trial motions. The instant appeal and cross appeals followed.

## I.  The Court Erred in Entering Judgment Finding Universal Obligated to Indemnify the Original MMPA Action Judgment.

After conducting a bench trial on Count I (equitable garnishment) and Count II (declaratory judgment) the trial court entered judgment finding that the insurance policy terms were ambiguous, construing them in favor of coverage, and entering judgment against Universal for the sums owed by Franklin in the Original MMPA Action judgment ($647,421.39).  Notably, the trial court made no findings whether the acts of Franklin giving rise to the MMPA Action judgment were intentional, and did not endeavor to discern whether it mattered.

---

[8] The jury awarded no damages to the Heckadons under their MMPA claim.  After trial, the parties stipulated that the trial court had found that the Heckadons' claims for civil conspiracy and joint venture were not stand alone claims and were not submitted to the jury.  In that same stipulation the Heckadons also dismissed their claim of bill in equity with prejudice.

Universal maintains the trial court was in error (1) in finding that the exclusions in the policy did not apply, (2) in finding that the actions of Franklin constituted an "occurrence" as defined by the policy, and (3) in finding that the term "damages" included punitive damages.

Because we find no ambiguity in the applicable terms of the policy, because the definition of covered occurrences did not include intentional misconduct, and because Franklins' actions (as alleged by the Heckadons in their claim for punitive damages in the original MMPA Action) were intentional, we find that Universal was not obligated to indemnify the Franklins. We reverse the trial court for the reasons set out below.

As in any other court-tried matter, we review the trial court's judgment under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 705 (Mo. App. W.D. 2010). "[W]e will affirm the judgment unless it is against the weight of the evidence, it is not supported by substantial evidence, or it erroneously declares or misapplies the law." *Penn-Star Ins. Co. V. Griffey*, 306 S.W.3d 591, 596 (Mo. App. W.D. 2010). However, "[t]he interpretation of an insurance policy is a question of law" and as a consequence our review of the language of the contract is essentially *de novo*. *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007).

Before beginning our analysis we recognize that "'[i]n general, an insurance policy is a contract to afford protection to an insured and will be interpreted, if reasonably possible, to provide coverage.'" *Safeco Ins. Co. Of Am. V. Smith*, 318 S.W.3d 196, 199 (Mo. App. W.D. 2010) (quoting *Haulers Ins. Co. v. Pounds*, 272 S.W.3d 902, 905 (Mo. App. S.D. 2008)). In the process of conducting that review:

> It is a longstanding principle that courts "read a contract as a whole and
> determine the intent of the parties, giving effect to that intent by enforcing the
> contract as written." In so doing, we give the language in an insurance contract

10

its plain and ordinary meaning. "If, giving the language used its plain and ordinary meaning, the intent of the parties is clear and unambiguous, we cannot resort to rules of construction to interpret the contract."

*Peterson v. Discover Prop. & Cas. Ins. Co.,* 460 S.W.3d 393, 402–03 (Mo. App. W.D. 2015) (internal citations omitted) (quoting *Thiemann v. Columbia Pub. Sch. Dist.,* 338 S.W.3d 835, 840 (Mo. App.W.D. 2011)).

When evaluating whether a party pursuing a claim of equitable garnishment establishes coverage, "the burden of showing that the loss and damages are covered under the insurance policy is placed on the plaintiff; the burden of showing that there is an applicable exclusion is on the defendant insurer." *Am. States Ins. Co. v. Herman C. Kempker Const. Co.*, 71 S.W.3d 232, 235 (Mo. App. W.D. 2002). *See also Fischer v. First Am. Title Ins. Co.,* 388 S.W.3d 181, 187 (Mo. App. W.D. 2012) ("[T]he insured bears the burden of proving coverage under an insurance policy….").

In the instant case, the trial court found that coverage was provided under coverage parts 500 and 970 of the 2008 Universal policy which would indemnify Franklin for the Heckadons' judgment in the Original MMPA Action. The policy language, in relevant part, provides coverage for injury as follows:[9]

> WE will pay those sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies…caused by an OCCURRENCE arising out of YOUR GARAGE OPERATIONS.…"

Both coverage parts utilize the same definition of "occurrence" which states, in relevant part:
> an accident, including continuous or repeated exposure to conditions, which results in such INJURY or COVERED POLLUTION DAMAGES

---

[9] We have provided the coverage language for Coverage Part 500. While Coverage Part 970 utilizes slightly different language, the import is not functionally different. Coverage Part 970, in relevant part, provides that "WE will pay those sums the INSURED legally must pay as DAMAGES because of INJURY to which this insurance applies, caused by an OCCURRENCE."

11

during the Coverage Part period neither intended nor expected from the standpoint of a reasonably prudent person.

The Policy also excludes coverage under both coverage parts, in pertinent part, as follows:

This insurance does not apply to:
B.  Dishonest Acts
an OCCURRENCE, SUIT or claim arising out of any dishonest, fraudulent or criminal acts committed by any INSURED.
….
B. Intent to Cause Harm
any act committed by or at the direction of the INSURED with intent to cause harm.

The Heckadons asserted, and the trial court found, that the language of the policy is conflicting and ambiguous.  We disagree, as there is nothing facially vague or ambiguous in the policy language.  The policy provides coverage for occurrences which it defined as accidents resulting in an injury "neither intended nor expected from the standpoint of a reasonably prudent person."  The policy excludes coverage for actions that are dishonest, fraudulent or criminal, or where harm is intended.[10]

---

[10] The Heckadons argue that the policy's conflicting definitions of a covered "occurrence" render the policy inherently contradictory.  In doing so, the Heckadons point out that the policy's separate coverage for STATUTE AND TITLE E&O (for coverage of odometer misrepresentations, truth in lending violations and truth-in-leasing violations) provides coverage for intentional acts, and that this conflicts with its definition of an occurrence (as accidental injury).  However, this argument is flawed because it fails to recognize that the coverages (in both policies) for those particular intentional acts (INJURY GROUPS 3, 4, and 5) include their own, separate, definition of a covered "occurrence."

The 2008 Garage Policy defines such occurrence as:
    2. with respect to INJURY Groups 3, 4, 5 and 6, acts or offenses of the INSURED which result in such INJURY

The 2008 Umbrella Policy defines such occurrence as:
    2. with respect to INJURY Groups 3 and 4, acts or offenses of the INSURED which result in such INJURY."

As a consequence, it is clear that the presence of coverage for these "intentional" acts does not present a conflict or create an ambiguity regarding the definition of "occurrence" at issue because there is a separate definition of occurrence for those claims and that definition does not include "accident" or the "intended and expected language." Instead, in situations such as a failure to properly comply with a Truth in Lending (TIL) statement, an occurrence

12

While "accident" is not defined, "[i]t is well-settled Missouri law that when a 'liability policy defines occurrence as meaning accident Missouri courts consider this to mean injury caused by the negligence of the insured.'" *Stark Liquidation Co. V. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 393 (Mo. App. W.D. 2007) (quoting *Wood v. Safeco Ins. Co. of Am.,* 980 S.W.2d 43, 49 (Mo. App. E.D. 1998). Where the act was intended and the harm expected or intended, coverage does not apply. *Am. Family Mut. Ins. Co. v. Franz*, 980 S.W.2d 56, 57-58 (Mo. App. W.D. 1998); *Cameron Mut. Ins. Co. v. Moll*, 50 S.W.3d 329, 332–33 (Mo. App. E.D. 2001).

In *Lewellen v. Universal Underwriters Ins. Co.*, No. WD 81171, 2019 WL 579635 (Mo. App. W.D. Feb. 13, 2019), *reh'g and/or transfer denied* (Mar. 26, 2019) (hereafter *Lewellen II),*[11] in a matter that had been consolidated with the instant action for trial on issue of insurance coverage, we recently addressed an identical policy, found no ambiguity, and addressed covered occurrences as follows:

> "The determinative inquiry into whether there was an 'occurrence' or 'accident' is whether *the insured* foresaw or expected the injury or damages." However, in reviewing the insured's foresight of these injuries we employ an

triggering coverage happens *whenever* an insured commits an action which causes an injury covered by the policy. Based on the facts in this case and the evidence adduced at the bench trial, the Heckadons are not asserting that they are covered by these injury groups. The Heckadons stated in their answers to interrogatories that they were not in those injury groups and only have argued the definition of occurrence for the injury group they relied upon at trial and on appeal, as set forth in parts 500 and 970 of the policy. Their reference to, and reliance upon, a coverage that is entirely separate, not claimed, and which has an entirely different definition of a covered "occurrence" merely confuses the issue and is not germane to determination of the coverage under the policy which is at issue.

[11] Like the instant case, *Lewellen II* also involved a plaintiff who had prevailed in an earlier lawsuit against Franklin, then brought an equitable garnishment action against Universal, in which she also made claims against Universal and Franklin regarding the distribution of the bad faith settlement proceeds. The *Lewellen II* case (along with a third case) were consolidated with the instant action for discovery purposes on all issues and were consolidated for hearing on the claims of equitable garnishment and declaratory judgment against Universal (and were heard together at the bench trial).

In this opinion we cite the Missouri Supreme Court opinion *Lewellen v. Franklin*, 441 S.W.3d 136 (Mo. banc 2014), which addressed the original judgment entered against Chad and CFS. We also cite our more recent opinion which addressed the Lewellen action that was consolidated (for some purposes) with the instant action: *Lewellen*, 2019 WL 579635. We will refer to the earlier Supreme Court opinion as *Lewellen I*. We will refer to the recent opinion of this Court as *Lewellen II*.

13

objective standard—whether a reasonably prudent person would foresee this accident—instead of an analysis of Franklin's subjective intent or expectation.

*Id*. at *5 (quoting *D.R. Sherry Constr., Ltd., Am. v. Family Mut. Ins. Co.*, 316 S.W.3d 899, 905 (Mo. banc 2010) (emphasis added)).

Whether Franklin committed actions that triggered Universal's duty to indemnify is determined by the facts established in the Original MMPA Action. *See McCormack Baron Mgmt. Servs., Inc. V. American Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. banc 1999) ("The duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement. 'The insurer's duty to pay arises only after the suit by the third party is successful and the insurer becomes obligated to pay the resulting judgment.'" (internal citations omitted)).

In the Original MMPA Action, the Heckadons established that Franklin intentionally lured customers (including the Heckadons) into an elaborate and inherently fraudulent scheme that foreseeably caused them financial harm. To support their claim for actual economic damages, the Heckadons introduced evidence that Franklin had falsely inflated the price of the car they were sold. Franklin charged them $19,495 for a car with a sticker price of $17,495; and added $1,112 for an extended warranty, $540 for gap insurance, and $499.95 for an administrative fee to participate in the "Drive for Life" program. To qualify the Heckadons for a loan to purchase the car, Franklin had to intentionally falsify the Heckadons' income, increasing it by $2,000 a month. This allowed Franklin to induce the Heckadons to sign a loan obligating them to repay the over-valued price of the car in installments of $647.37 a month. Franklin was able to hide these charges because the program called for the Heckadons to turn the car back in

14

after six months, permitting Franklin to convince the Heckadons that the price of the car, and the monthly payment, was immaterial, as they would only be responsible for $49 a month.

The evidence and argument the Heckadons put forward in the Original MMPA Action that resulted in the award of punitive damages was not limited to the actions that harmed them. The Heckadons introduced numerous witnesses and offered substantial evidence to show that Franklin repeatedly and intentionally used deceptive business practices in furtherance of a complex, fraudulent scheme.

Missouri law provides that coverage for accidental injury is barred by the "expected and intended" language if it is shown that (1) the insured intended the acts causing the injury, and (2) injury was expected or intended from these acts. *Franz,* 980 S.W.2d at 58. The question of whether harm was intended "can be inferred from facts and circumstances surrounding an act." *Truck Insurance Exchange v. Pickering,* 642 S.W.2d 113, 116 (Mo. App. W.D. 1982) (quoting *Subscribers At Auto. Club, Etc. v. Kennison,* 549 S.W.2d 587 (Mo. App. 1977)). Franklin's conduct as alleged and proved by the Heckadons in the Original MMPA action was clearly deliberate and not consistent with mere negligence or mistake.[12] The Heckadons,

---

[12] In the Original MMPA Action, the Heckadons were required to establish the following elements: (1) a use or employment of a deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or concealment, suppression, or omission of a material fact; (2) the unlawful act must occur in connection with the sale or advertisement of merchandise in trade or commerce; (3) the unlawful act must result in an ascertainable loss of money or real or personal property; and (4) the loss must occur to a person who purchases or leases merchandise primarily for personal, family, or household purposes. *Chochorowski v. Home Depot U.S.A., Inc*., 295 S.W.3d 194, 198-199 (Mo. App. E.D. 2009). While this standard does not require the commission of an overt, intentional act, there is a need to show that the consumer was misled and did not receive what they were promised. To establish this element, the Heckadons' petition alleged that the required "fraud deception, fraud, false pretenses, false promises, misrepresentations, concealment, suppression and omission were made by [CFS/Franklin]…through their agents and employees, with the intent that the Heckadons rely on such in connection with the sale of said vehicle." At trial the Heckadons argued that the misrepresentations and fraud that resulted in their overpaying for a vehicle was part of an extended, coordinated scheme to defraud hundreds of low income, vulnerable consumers. They introduced

15

however, argue that because an MMPA claim does not necessarily require a jury to find fraudulent intent, the Original MMPA action does not establish that Franklin acted intentionally, or, more particularly, that Franklin knew its actions would cause harm. [13] Even if we were to find that the actual damages awarded did not, in and of itself, establish intentional acts, the jury's assessment of punitive damages, and the legal arguments and evidence submitted by the Heckadons that established the right of submission of punitive damages to the jury, did establish that Franklin's actions were intentional.

Though the MMPA judgment did not require a finding of fraudulent intent, the Plaintiffs' evidence (in the Original MMPA Action and in the instant action) consistently indicated that Franklin intentionally defrauded them and numerous other consumers. It is difficult to envisage a scenario where an affirmative verdict does not incorporate such a finding. More importantly, it remained the Heckadons' burden to prove that coverage applied: that the acts of Franklin were a covered occurrence. *Fischer*, 388 S.W.3d at 187; *Kempker Const. Co.*, 71 S.W.3d at 235. Through the evidence, pleadings, and argument they presented in the Original MMPA Action the

___

evidence not only to show that they were defrauded but to also prove that Franklin acted with the same intent in defrauding hundreds of other consumers. This in turn, established that Franklin was engaged in a pattern and practice of such behavior – that their injury was not an isolated occurrence that resulted from negligence. In particular, the Heckadons put into evidence the testimony of five other victims who related that Franklin had engaged in lies and misrepresentations to defraud them.

[13] In the Original MMPA Action, in Instruction Number 21 the Heckadons asked the jury to award them damages amounting to the difference in the actual value of the vehicle they were sold and the amount that Franklin had induced them to pay by his misrepresentations:

> "If you find in favor of the Plaintiffs David Heckadon and Diana Lynn Heckadon against [Franklin], then you must award Plaintiffs such sum as you believe was the difference between the actual value of the 2008 Suzuki motor vehicle the on date [sic] it was sold to Plaintiffs and what its value would have been on that date had the 2008 Suzuki motor vehicle been as represented by Defendant."

16

Heckadons have asserted repeatedly that Franklin acted intentionally; and they presented no substantial evidence to the contrary at the bench trial.

As related at the trial, Franklin invested well over a million dollars in advertising that particularly targeted financially vulnerable, low income individuals to induce them to purchase cars at falsely inflated prices, financed by onerous loans based on the fiction that they would not be obligated to pay those loans. This scheme routinely relied on Franklin falsifying the income of participants, such as the Heckadons, as a necessary part of qualifying them for loans that they were unable to pay. To show the breadth of the deception, Plaintiffs introduced testimony from Shelly Land, an investigator with the Missouri Attorney General's office, who shared that over 169 complaints from Missouri citizens had been made about the "Drive for Life" program. They also elicited the sworn testimony of five victims, in addition to the Plaintiffs themselves, who testified that they had been misled by Franklin or its agents. These witnesses characterized the actions of Franklin as lying, a scam, deceptive and dishonest. Plaintiffs introduced evidence that Franklin had sold hundreds of cars in 2007 and 2008 as a result of the "Drive for Life" promotion. They argued that Franklin had made over $10,000 in profit just from the vehicles they had sold to the Heckadons and over $4,457,000 of profit on the vehicles sold to others.

Plaintiffs further argued that Franklin had accomplished these sales by a program that misrepresented, misled, and deceived hundreds of consumers over an 18-month period. The jury found that punitive damages were appropriate and awarded them to the Heckadons in the amount

17

of $500,000 in the original MMPA action.[14]

We do not go so far as to hold that the assessment of punitive damages is equivalent to a jury finding of intent in all cases. However, where, as is the case here, the evidence and sole legal theory enabling the grant of such a proportionally large award in the Original MMPA Action was that the defendant engaged in a pattern of intentionally fraudulent misconduct, the imposition of liability (particularly for punitive damages) established that Franklin's actions were intentional. The intentional trickery of Franklin that was part of a pattern and practice of behavior was the basis by which the proportionally high damages award was upheld by this Court in *Heckadon v. CFS Enterprises, Inc.*, 400 S.W.3d 372, 382–83 (Mo. App. W.D. 2013).

> Here, the facts and circumstances of this case support the jury's deviation from the single-digit ratio between actual and punitive damages. This case presents a situation in which Appellants used trickery and deceit to misrepresent the terms of a promotional program that targeted financially vulnerable individuals. That same misconduct affected numerous people throughout the

---

[14] The use of this type of evidence was challenged by Franklin in *Lewellen I*. 441 S.W.3d at 145. In that appeal of an action based on the same Drive for Life program, Franklin argued that it incurred a disproportionately high punitive awards that violated their right to due process. *Id.* Franklin complained that the trial court had not ensured that evidence of other deceptive occurrences had happened prior to the subject of the lawsuit and argued that only prior misconduct is relevant in assessing punitive damages. *Id.* at 146-47.

The Missouri Supreme Court first found that the punitive damage award was not disproportionate because the nature of Franklin's conduct was reprehensible enough to warrant a sizeable punitive award and the evidence was necessary to establish that reprehensibility. *Id.* at 146 ("The Supreme Court has recognized that 'trickery and deceit are more reprehensible than negligence' and that 'infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty.'" (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 576, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996))). Similarly, in holding that the trial court did not err in ensuring that only evidence of prior misconduct was introduced, the Missouri Supreme Court determined that the relevant inquiry was whether a defendant had engaged in a pattern of misconduct, not when that conduct occurred:

> The emphasis on prior transgressions, however, was in recognition that "repeated misconduct is more reprehensible than an individual instance of malfeasance." Therefore, this Court finds that any sufficiently similar misconduct, regardless of when it occurred, is relevant in assessing the reprehensibility of a defendant's conduct. Mr. Franklin's and National's repetitive use of intentionally deceptive business practices targeting financially vulnerable persons weighs in favor of a higher punitive damages award.

*Id.* at 147 (internal citation omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

18

Kansas City metropolitan area. Furthermore, Franklin, who took the stand in both his individual capacity and as a CFS representative, made no attempt to explain or show remorse for his conduct.

*Id*. at 384-85. It is inconsistent to assert on the one hand that the actions of Franklin merited the imposition of punitive damages based on evidence that they had defrauded over a hundred customers with an elaborate and long running scheme *and* to maintain that the award of punitive damages did not constitute a finding that Franklin had acted intentionally.

This outcome is consistent with *Universal Underwriters Ins. Co. v. Dean Johnson Ford, Inc.,* 905 S.W.2d 529 (Mo. App. W.D. 1995). In *Dean Johnson Ford*, this Court, interpreting essentially the same contract at issue here, found that an insurer had a duty to defend, but a duty to defend only, because it was not known whether the covered MMPA violations would be found to be the result of actual fraud or dishonesty. *Id*. at 533-35. In that case the insurer had declined to either indemnify or defend its insured despite the fact that it had not been proven that the insured had acted fraudulently or dishonestly. *Id*. The Court did not find an inherent conflict between an exclusion for fraudulent or illegal acts and a coverage provision for legal damages, when it had not *yet* been shown that the dealer had been intentionally dishonest or fraudulent in violating the MMPA. *Id*. As held below:

> A more reasonable interpretation, and one which gives effect to both the exclusion and the provisions for defense costs for Legal Damages and for Product Related Damages, is that the exclusion simply excluded coverage for damages actually awarded against the insured for acts proved to be intentionally dishonest or fraudulent. At this point, the Dealership has not been proved to be dishonest or to have acted fraudulently. The Dealership is simply requesting up to $10,000 of the costs of *defense* of a *claim* that the Dealership may have acted fraudulently and up to $10,000 of the costs of *defense* of a *claim* that they may have violated the merchandising laws. In light of the rule that ambiguities will be resolved against the insurer, we will not interpret the exclusion to deny a right to recovery of such *defense* costs.

19

*Id*. at 534-35 (internal citation omitted). The *Dean Johnson Ford* case can be distinguished in three ways: (1) it only decided (in advance of the MMPA trial) the duty to defend; (2) it addressed the application of an exclusion of coverage (which was the insurer's obligation to prove); and (3) it did not directly address the duty to indemnify and indicated that obligation was a separate issue that remained to be determined (depending on whether the acts of the insured were later shown to be intentional). *Id*

In this instance, the Heckadons' claims and resulting judgment in the Original MMPA action determined that Franklin knowingly violated the MMPA by fraudulently selling a car for more than its actual value. The Heckadons cannot now contend that Franklin's elaborate scheme was not dishonest or the result of mere negligence; and they have presented no substantial evidence that the events giving rise to the judgment in the Original MMPA Action were a covered occurrence (an accident) under the Universal policy.

Point 2 of Universal's cross appeal alleging that the Court erred in finding Franklin's conduct was a covered occurrence is granted. We therefore reverse the equitable garnishment judgment entered against Universal.[15]

## II. The Court Did Not Err in Granting Universal Summary Judgment on the Heckadons' Claims Relating to Distribution of the Bad Faith Claim Settlement Proceeds.

The Heckadons asserted that Franklin, Universal, and Tiffany conspired to defraud them (as Franklin's creditors) of $650,000 of the bad faith claim settlement proceeds. The trial court granted summary judgment to Universal, finding it was not obligated with respect to its distribution of the $900,000 it paid to settle the bad faith litigation. In Points 3, 4, and 5 of their appeal, the Heckadons claim that the court erred in granting summary judgment on Count III

---

[15] Our disposition of Point 2 makes it unnecessary that we address Points 1 and 3 of Universal's cross appeal.

(fraudulent transfer), Count V (civil conspiracy), and Count VIII (tortious interference with a business expectation). We review a grant of summary judgment under the following standard:

> Summary judgment is appropriate only when the moving party demonstrates that there is no genuine dispute as to the facts and that the facts as admitted show a legal right to judgment for the movant. The movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment. The propriety of summary judgment is purely an issue of law, and this Court's review is essentially *de novo*. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*Bob DeGeorge Assoc.'s, Inc. v. Hawthorn Bank,* 377 S.W.3d 592, 596 (Mo. banc 2012) (internal citations and quotation marks omitted) (quoting *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 380 (Mo. banc 1993)).

In its order awarding summary judgment in favor of Universal, denying the Heckadons' claim that Universal's distribution of the bad faith settlement funds was a fraudulent transfer, the trial court cited *Mark VII, Inc. v. Barthol,* 926 S.W.2d 128, 131 (Mo. App. W.D. 1996) for the proposition that, without a valid lien, a potential creditor cannot maintain a cause of action against a third party (such as Universal) for fraudulent transfer. The Heckadons urge this Court to find that *Barthol* is no longer valid law in light of Missouri's adoption of MUFTA. That act, in relevant part, finds that a debtor fraudulently transfers an asset if the transfer was made with the intent to defraud a creditor, even if the transfer was made before the creditor's claim was matured, liquidated, or reduced to a judgment. § 428.024.1(1).[16] The Heckadons point out that § 428.009(3) defines a claim as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

---

[16] All statutory references are to the Revised Statutes of Missouri 2016.

21

legal, equitable, secured, or unsecured." They urge this Court to find that, by adopting the UFTA through the enactment of the MUFTA, Missouri has statutorily modified the "common law rule so that, even without a lien, a transfer to defeat a creditor who has filed a claim nevertheless constitutes a legal wrong and an underlying cause of action for a conspiracy claim." *Double Oak Const., L.L.C. v. Cornerstone Dev. Int'l*, 97 P.3d 140, 146 (Colo. App. 2003). This interpretation of the UFTA, which would allow a tort claimant to maintain a claim against a third party creditor (like Universal) for conspiracy with a tortfeasor (like Franklin) for fraudulent transfer, is commonly referred to as the minority view. *Id*. at 146-47.

The MUFTA, particularly § 428.024.1, speaks to the actions of debtors and creditors: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor…" The majority view holds that the language of the UFTA only allows for equitable remedies against the debtors and transferees and that claims of civil conspiracy "[do] not expand the remedies afforded by UFTA." *Forum Ins. Co. v. Devere Ltd.*, 151 F.Supp.2d 1145, 1148-50 (C.D. Cal 2001).

This issue of first impression is addressed in full in *Lewellen II*, 2019 WL 579635. In *Lewellen II*, this Court declined Lewellen's request for this Court to adopt the minority interpretation of the UFTA and permit a cause of action for fraudulent transfer and civil conspiracy against a third party when the transaction was not encumbered by a valid lien. *Id*. at *10-12. We see no value in engaging in duplicative analysis of this question. However, we do note that the same argument brought by multiple litigants, all claiming a right to the entirety of the funds that were the subject of the allegedly fraudulent conveyance, provides a real time illustration of why we choose to follow the majority view and retain the lien requirement. In the absence of requiring a lien:

> There is a "practical inconvenience of the remedy and the chance of its working injustice to other creditors of the debtor than the one who files the first action." Oftentimes, more than one creditor will have been defrauded. Rather than having a race to the courthouse, the lien provides the avenue for a court to apportion the property's value among other creditors.

*Barthol*, 926 S.W.2d at 131–32 (quoting *Fernandez v. La Mothe*, 147 Mo. App. 644, 127 S.W. 408, 410 (1910)).

MUFTA is not in conflict with the principle set forth in *Barthol*. To the extent it expands the remedies available to creditors it does so as to actions against debtors and transferees, not to third parties.[17] *See Curtis v. James*, 459 S.W.3d 471, 476-77 (Mo. App. E.D. 2015) (allowing a personal injury claimant, prior to obtaining judgment on his personal injury claim, to pursue an action to void a debtor's transfer of assets into a trust). As in *Lewellen II*, we find that the adoption of the MUFTA does not provide a cause of action for fraudulent transfer against a third party. We therefore deny the Heckadons' third and fourth[18] points on appeal claiming that the trial court erred in granting Universal summary judgment on the Heckadons' claims of fraudulent transfer and civil conspiracy to commit a fraudulent transfer.

The Heckadons' fifth point on appeal claims that the trial court erred in granting summary judgment in favor of Universal regarding their claim that the disbursal of funds to

---

[17] We note that Tiffany Franklin, the individual who received the allegedly fraudulently transferred funds was a defendant in this litigation but was dismissed by the Heckadons prior to trial.

[18] In their fourth point, the Heckadons' seek to hold Universal liable for acting in furtherance of Franklin's fraudulent transfer. Our finding that the Heckadons' did not have a cause of action against a third party (Universal) for fraudulent transfer effectively disposes of this claim. Furthermore, the Heckadons' reliance on *Fawkes v. National Refining*, 108 S.W.2d 7, 10 (Mo. 1937), is misplaced. *Fawkes* indicated that "an admission against interest by one [defendant] is binding on the others." *Id.* The Heckadons argue that this means that the allegations that they pled against Franklin, which were established as a result of the sanction striking Franklin's pleadings, were also binding on Universal. However, *Fawkes* only applies in a situation where "the common interest of the codefendants extends not only to the entire recovery, but covers the entire ground of liability and the codefendants if liable at all are liable jointly." *Id.* Since we do not find that Universal, as a third party, could be liable for a fraudulent transfer absent a valid lien, this is not a scenario where, if Franklin and Universal are "liable at all [they] are liable jointly." The Heckadons' fourth point on appeal is denied.

23

Tiffany Franklin constituted tortious interference with a business expectancy. "A submissible case of tortious interference requires the plaintiff to adduce evidence of: (1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 250 (Mo. banc 2006). The Heckadons provide no support for their assertion that a lawsuit against a party (their suit against Franklin) meets the minimal definition of "[a] probable future business relationship…." as required by the law; and we find no basis to do so. *Id.* at 251. The Heckadons' fifth point on appeal is denied.

We affirm the Summary Judgment in favor of Universal.

### III.  Evidentiary errors require a new trial on damages.

Because the trial court struck Franklin's pleadings as a discovery sanction, the disputed issue at the jury trial was the amount of the damages due the Heckadons for their claims against Frankin regarding Franklin's fraudulent transfer of the bad faith settlement proceeds. The primary dispute regarding actual damages was whether Mayer, Franklin's counsel for the bad faith action, had a valid lien on the $383,629.59 in settlement funds they received in compensation for prosecuting the suit. The trial court refused an instruction proposed by Franklin that would instruct the jury that, under Missouri law, any portion of the $900,000 settlement from the bad faith action that was encumbered by a valid lien could not be considered in calculating damages. While the trial court refused this request, it permitted Franklin to introduce evidence of that lien and to argue what effect it would have on the amount of damages. At trial, Franklin introduced evidence substantiating the attorney's lien through the testimony of Mayer, a copy of the contingent fee contract that Chad and Tiffany signed with Mayer's firm, and a copy of the letter notifying Universal that Mayer was representing Chad and Tiffany. The

24

Heckadons put on rebuttal testimony by James Thompson, an attorney, who testified that in his expert opinion the contingency contract did not create a valid lien under Missouri law.

Franklin raises four points on appeal, alleging that the trial court erred in striking their pleadings, in submitting an instruction and verdict director which presumed the imposition of punitive damages, and in not permitting Mayer to testify as to the rationale for the allocation of the settlement funds.

**The trial court did not err in striking Franklin's pleadings.**

Franklin appeals (in their Point 1) the decision of the trial court to strike their pleadings as a discovery sanction, arguing that it was an overly harsh remedy and an abuse of discretion because a lesser sanction would have served Plaintiffs need for discovery. We disagree.

A circuit court has broad discretion in determining the admission of evidence and imposing sanctions for discovery violations. *Giddens v. Kansas City S. Ry. Co.,* 29 S.W.3d 813, 819 (Mo. banc 2000). The decision of the trial court will not be overruled absent an abuse of discretion. *Id.* We find an abuse of discretion "when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* Even were error to be shown, this Court will not reverse a judgment unless the erroneous sanction resulted in prejudice. *Id.*

In the instant case, after repeated attempts to get Chad to agree to a deposition date, the Heckadons properly noticed a deposition for Chad and a corporate representative for CFS and NAS. No one appeared at that deposition. On February 11, 2016, the Heckadons filed a motion seeking sanctions against Franklin for that failure to appear. At a hearing on this motion on February 24, 2016, the trial court entered an order compelling Chad to appear in his personal

25

capacity and as a corporate representative at a date established by the Heckadons. The order informed Chad that failure to appear at this deposition would result in sanctions, including the striking of Franklin's pleadings and the entry of an interlocutory default judgment. Chad failed to appear at the deposition on March 14, 2016, and Plaintiffs filed a motion for sanctions.

On March 29, 2016, the trial court heard testimony and argument on that motion. Counsel for Franklin informed the trial court that he had recently been informed that Chad's lack of availability was due to his enrollment in a drug treatment facility. Chad's counsel indicated he could not reach Chad to confirm this information, and instead elicited testimony from Chad's parole officer, Larry Anthony. Anthony testified that, on January 21, 2016, Chad was required to submit to a urinalysis test as a condition of his supervised release. Before submitting to the random drug test, Chad confessed to Anthony that the sample would be positive. Subsequently, Chad informed Anthony that he had secured entry into a drug treatment facility in California. On February 11, 2016, Chad reported in person and Anthony then issued him a travel permit to leave the state to commence the drug rehabilitation program. Anthony testified that he had not spoken with Chad since issuing the travel permit and was under the belief that his obligations to report would be halted until he exited the rehabilitation center.

After hearing this testimony and argument from both parties, the trial court struck the pleadings of Franklin and entered an interlocutory judgment by default for the Heckadons against Franklin. The trial court also granted the Heckadons' motion to quash when Chad later served a notice of his own deposition.

Franklin asserts that the trial court's ruling was arbitrary and that Chad's repeated failure to appear for depositions was excusable because his inability to be reached by counsel was related to his participation in a drug treatment program. Franklin contends that any delay caused

26

by Chad's failure to appear did not result in prejudice to the Heckadons, and that the trial court improperly considered his previous discovery violations in unrelated cases. Franklin correctly notes that that the trial court took judicial notice of other cases but neglects to mention that two of the cases noted by the trial court had been merged with the Heckadons' case for discovery purposes. Franklin cites no authority to suggest it was inappropriate for the Court to consider such other discovery violations in addressing the motion for sanctions.

The striking of pleadings is an authorized sanction for repeated failure to comply with the discovery process. Rule 61.01(d)(2). The rules specifically provide that this sanction is within a court's discretion for failure of a party to appear at its deposition. Rule 61.01(f). This Court is not moved by Franklin's argument that Chad's failure to appear was excusable since he was participating in a drug rehabilitation program. Chad was aware of the lawsuit against him when he voluntarily entered that program. Chad failed to notify his counsel where he was going, failed to make arrangements so that he could be contacted, and did not keep in contact with his counsel during this extended time. This Court is not required to presume that a party was acting in good faith. *Davis v. Chatter, Inc.*, 270 S.W.3d 471, 479 (Mo. App. W.D. 2008). We do not find that the sanctions imposed by the trial court were an abuse of discretion. In *Lewellen II*, 2019 WL 579635 at \*16 (which was consolidated with the instant action for discovery purposes), we addressed the very same conduct of Franklin and affirmed the trial court's sanction. Point 1 of Franklin's cross appeal is denied.

**The trial court erred in excluding relevant testimony regarding punitive damages.**

In Franklin's fourth point on appeal, he argues that the trial court erred in limiting the testimony of Mayer, Franklin's attorney in the bad faith litigation. While the trial court's sanction permitted Franklin to litigate the amount of damages, the trial court excluded testimony

that Franklin contended was relevant both to whether punitive damages should be imposed and in what amount they should be imposed. Specifically, in an offer of proof, Mayer testified that Tiffany was added to the lawsuit on his advice as counsel and provided the rationale he had for recommending that Tiffany be included as a party in the lawsuit, how her presence aided the lawsuit, and the reasons for the allocation of the settlement funds. Mayer also noted that, at the time of settlement, Chad and Tiffany were married but had begun the process of divorcing, limiting the benefit to Chad of Tiffany receiving the settlement funds. Finally, Mayer's testimony sought to clarify that the nature of the distribution to Fifth Third Bank was for the partial satisfaction of a judgment lien against Chad personally. Prior to trial, Franklin argued that introducing this evidence was necessary for the jury to properly decide whether his actions were "reprehensible" such that punitive damages were warranted and, if they were, the proper amount of the punitive damages. The trial court agreed with the contention of counsel for the Heckadons that the introduction of this evidence would have effectively reopened the issue of liability that had been settled by the sanction in this case and was therefore not proper. We disagree.

The evidence Franklin sought to introduce was relevant to a question at issue in the trial, i.e., what punitive damages, if any, were appropriate. Evidence of the type included in Mayer's offer of proof could have demonstrated that Franklin's actions, while damaging to his creditors, were not the result of "evil motive or reckless indifference." The central inquiry into whether large punitive damage awards are supportable is the level of the reprehensibility of the conduct. *Lewellen I*, 441 S.W.3d at 145. *See also Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 380 (Mo. banc 2012) ("[t]he reprehensibility of the defendant's conduct is a key factor in determining the amount of punitive damages to which a plaintiff is entitled.").

28

While evidence relevant to Franklin's motive and the reprehensibility of his conduct overlapped with the issue of liability that had been determined as a result of the sanction in this case, the trial court's attempt to preserve the effect of that sanction went too far. "[E]vidence which is inadmissible for one purpose may be admissible for another." *Danbury v. Jackson Cty.*, 990 S.W.2d 160, 165 (Mo. App. W.D. 1999). Missouri courts have an established method for addressing the presence of such evidence. "When a trial court receives evidence admissible for one purpose but not for another, a party upon request is entitled to an instruction limiting the extent and purpose for which the jury may consider the evidence." *Sapp v. Morrison Bros. Co.*, 295 S.W.3d 470, 483–84 (Mo. App. W.D. 2009) (quoting *Eltiste v. Ford Motor Co.,* 167 S.W.3d 742, 756 (Mo. App. E.D. 2005). *See also Lane v. Amsted Indus., Inc.,* 779 S.W.2d 754, 759 (Mo. App. W.D. 1989) (acknowledging that when evidence of a defendant's "conduct and state of mind are irrelevant to the proof of compensation damages but are of the very essence of punitive damages, a plaintiff who seeks both measures courts befuddlement of the jury" but finding that the remedy is a limiting instruction, not exclusion of the evidence.).

To the extent the Heckadons were concerned that evidence related to Franklin's culpability for punitive damages would contaminate the issue of his liability, Missouri permits the bifurcation of a trial to consider evidence of punitive damages as a separate issue. § 510.263.[19] For whatever reason, plaintiffs chose not to do so in this case. While that is their prerogative, we do not believe it is appropriate for a plaintiff to utilize the effect of a sanction in

---

[19] The statute allows any party in a tort action tried before a jury to request a bifurcated trial. § 510.263.1. If requested, in the first phase the jury determines liability, compensatory damages and whether a defendant is liable for punitive damages. § 510.263.2. If a jury determines that a defendant is liable for punitive damages, a second stage is conducted where the amount of punitive damages are determined. § 510.263.3. Additional evidence, including evidence of a defendant's net worth, is admissible during this second stage. *Id*.

a fashion that permits it to categorically prevent the introduction of evidence that was otherwise properly admissible to allow the jury to determine the question of punitive damages. The trial court erred in not allowing Mayer to testify, subject to a limiting instruction, regarding the legal rationale for Tiffany's inclusion in the lawsuit. Franklin's fourth point on appeal is granted. Because evidence concerning the justification (if any) for Franklin's actions was central to the jury's assessment of the amount of punitive damages, the trial court's exclusion of Mayer's testimony materially affected the outcome of the trial, and necessitates a new trial on punitive damages. Given our disposition of Point 4, it is unnecessary for the Court to address the instructional errors claimed in Points 2 and 3 of Franklin's cross appeal.[20]

### The Trial Court erred in reducing the award of actual damages.

In sustaining Franklin's post-trial motion to amend the judgment, the trial court concluded that the jury's actual damages award of $647,334 included the distribution of funds to Mayer and Tiffany (which actually totaled $650,000); determined that Mayer had an attorney's fee lien and that the judgment should be reduced by the amount of the payment to Mayer ($383.629.59); and reduced the judgment for actual damages to $266,370.41 (the amount paid to Tiffany from the bad faith claims settlement).[21] In their first and second points on appeal, the Heckadons challenge the trial court's action in reducing the damages awarded against Franklin by the amount of the attorney's fees on two separate bases. The Heckadons contend this action was in error because (1) the amended judgment was entered more than 30 days after initial entry

---

[20] In *Lewellen II*, 2019 WL 579635, supra at 46-50, we have previously addressed similar claims of instructional error as set forth in points 2 and 3 of Franklin's appeal.

[21] While the trial court found that the jury included the funds paid to Mayer in its verdict, the $647,334 awarded by the jury is actually $666 less than the total of the Mayer fee ($383.629.59) and the payment to Tiffany ($266,370.41) which together total $650,000. The court indicated its intention to reduce the award by the Mayer fee, which have reduced the award to $263,704.41; but instead reduced it to the amount paid to Tiffany (to $266,370.41).

of judgment and was not pursuant to a proper post-trial motion; and (2) this action improperly invaded the province of the jury.

Our review of a trial court's grant of a post-trial motion is generally limited to determining whether the trial court's ruling on the motion represented an abuse of discretion. *Collier v. City of Oak Grove,* 246 S.W.3d 923, 925 (Mo. banc 2008), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29, 40 (Mo. banc 2013). However, where, as here, there is a question as to whether the trial court exceeded its authority by ruling on the untimely motion, we review that issue *de novo*. *State ex rel. Missouri Parks Ass'n v. Missouri Dep't of Nat. Res.*, 316 S.W.3d 375, 381 (Mo. App. W.D. 2010) ("The trial court's authority to enter amended judgments is a question of law which we review *de novo*."). Finally, while we accord the trial court broad discretion in its ruling on a post-trial motion, we review the trial court's compliance with Supreme Court rules *de novo*. *McGuire v. Kenoma*, 447 S.W.3d 659, 662 (Mo. banc 2014). While we disagree with the Heckadons' assertion that the trial court lacked authority to rule on Franklin's post-trial motion, we find that the action of the trial court was either procedurally improper or represented an impermissible invasion into the province of the jury.

In their first point on appeal the Heckadons claim that the trial court lacked the authority to reduce the award because its amended judgment was entered more than 30 days after it entered the original judgment, which exceeds the time frame to amend judgments as provided for

31

under Rule 75.01.[22]  However, a trial court's authority is extended if, within that thirty days, a party files a valid post-trial motion.  *Wiss v. Spitzmiller*, 425 S.W.3d 157, 162–63 (Mo. App. S.D. 2014) ("If an after-trial motion is filed within that 30 day period, the period for the trial court's ruling 'may be extended to ninety days' under Rule 81.05(a).").  That authority extends only "to remediating matters raised in the motion."  *Developers Sur. & Indem. Co. v. Woods of Somerset, LLC*, 455 S.W.3d 487, 491 (Mo. App. W.D. 2015).  Furthermore, "[o]nce the thirty day period in Rule 75.01 expires, a trial court's authority to grant relief is *constrained by and limited* to the grounds raised in a timely filed, *authorized* after-trial motion."  *Massman Const. Co. v. Missouri Highway & Transp. Comm'n*, 914 S.W.2d 801, 802–03 (Mo. banc 1996) (emphasis added).

The Heckadons contend that Franklin's post-trial motion requesting the trial court to reduce the verdict by the amount of the payment to Mayer was not a statutorily authorized post-trial motion, because it only cited Rule 75.01, and did not reference rule 78.04.[23]  Plaintiffs are correct that citation to Rule 75.01 alone does not provide a proper basis for a post-trial motion and would not extend the time a trial court has control over a judgment.  *Anderson v. Shelter Mut. Ins. Co.*, 127 S.W.3d 698, 701-02 (Mo. App. E.D. 2004). However, a request for a court to utilize its authority under 75.01 does not invalidate the motion as long as the movant raises appropriate grounds and requests relief that is available in a proper post-trial motion.  *Svejda v.*

---

[22] Civil Rule 75.01 provides, in relevant part: "The trial court retains control over judgments during the thirty-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time.  Not later than thirty days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party…."

[23] Civil Rule 78.04 provides, in relevant part: "Any motion for new trial and any motion to amend the judgment or opinion shall be filed not later than thirty days after the entry of judgment."

*Svejda*, 156 S.W.3d 837, 839 (Mo. App. W.D. 2005). "[I]n evaluating whether a pleading is an authorized after-trial motion, we do not concern ourselves with the title of the pleading or with a party's citation to a particular Rule, but we look instead to the substance of the pleading." *State ex rel. Missouri Parks Ass'n.*, 316 S.W.3d at 382. "In determining whether a motion is an authorized after-trial motion, Missouri courts have looked not to the nomenclature employed by the parties, but to the actual relief requested in the motion." *Berger v. Cameron Mut. Ins. Co.*, 173 S.W.3d 639, 641 (Mo. banc 2005).

In the instant case, Franklin's motion to amend argued that Mayer had a valid statutory attorney's fee lien on the bad faith settlement funds and that the payment to Mayer could not be considered as damages in the Heckadons' claim for fraudulent transfer (MUFTA). The motion sought the reduction of the award for damages by the amount paid to Mayer. Based on the relief sought, this represents either a motion for remittitur or a motion to amend the judgment, both of which are valid post-trial motions that extend the authority of the trial court up to 90 days to weigh the issues raised by the motion. Rule 78.04; *Massman Const. Co. v. Missouri Highway & Transp. Comm'n*, 914 S.W.2d 801, 803 (Mo. banc 1996). The trial court therefore had authority more than 30 days after it entered the original judgment, to rule on Franklin's motion to amend the judgment. Point 1 of the Heckadons' appeal is denied.

In the instant case, whether we conclude Franklin's motion was a request for remittitur or a motion to amend the judgment, we find that the trial court erred in the manner in which it granted the request. Even if Franklin was correct in his assertion that the amount of the verdict was the result of error, it is not error which is correctable by a Motion to Amend under Rule 78.04. Other than where it is provided for by statute or rule, "[a]fter a verdict has been received by the court and the jury discharged, a trial court has no authority to correct or amend it in

33

matters of substance, only in mere matters of form." *Kansas City Power & Light Co. v. Bibb & Assocs., Inc.*, 197 S.W.3d 147, 155 (Mo. App. W.D. 2006). "'While the court does have the authority to correct or amend a verdict after discharge of the jury, the power is limited to matters of form and does not extend to matters of substance.'" *Chapman v. New Mac Elec. Co-op., Inc.*, 260 S.W.3d 890, 895 (Mo. App. S.D. 2008) (quoting *Jordan v. Robert Half Personnel Agencies of Kansas City, Inc.,* 615 S.W.2d 574, 581 (Mo. App. W.D. 1981)). *Chapman* is instructive. In *Chapman*, the trial court decided, post-verdict, a ten year statute of limitations applied to the plaintiffs' award compensating them for sixteen years of trespass by defendant. *Id*. at 893. The trial court reduced the award by 24.5%, asserting that this action was a remittitur. *Id*.at 893-94. In finding that this action was improper, the court in *Chapman* stated:

> The trial court did not grant the purported remittitur in order to correct a verdict that exceeded the fair and reasonable compensation for Appellants' injuries. The trial court simply reduced the damages because of Cross–Appellant's claimed error in the admission of evidence….The trial court's actions were in essence a substitution of its assessment as to the amount of recovery for that of the jury. The court cannot, under the guise of amending the verdict, invade the province of the jury or substitute its verdict for the jury's verdict.

*Id.* at 895-96. We agree with the logic behind *Chapman* and find that the reduction in the verdict by the amount of the funds paid to Mayer represented an invasion of the province of the jury. Point 2 of the Heckadons' appeal is granted.

However, while we agree that the trial court erred in the manner in which it reduced the judgment, we concur with the trial court that it erred when it determined that whether or not Mayer had established a lien as to a third party was a question of fact for the jury to determine. At trial, Franklin argued that the filing of the bad faith claims against Universal by Mayer

34

established, as matter of law, an attorney's lien pursuant to § 484.130[24] and asserted that a directed verdict was appropriate. Ruling on that motion, the trial court concluded that § 484.130 only served to create a lien between an attorney and a client, while § 484.140, which directly addresses contingency contracts, was required to perfect a lien that would be valid against a third party:

> So the legal piece of it, the opinion of the Court is that the attorney's lien between an attorney and the client, in this case between Mr. Mayer's law firm and the Defendant and his entities, was an attorney/client relationship, would fall under subsection.130. The question of notice to a third-party, whether or not a third-party has to honor a lien, is different.
>
> So it's my belief it doesn't apply in the way that the Plaintiff has sought, that this is a question of fact for the jury to determine whether or not that money should be included in the damage.
>
> So I'm going to deny Plaintiffs' motion for directed verdict.

As the trial court observed in its amended judgment, this was a misstatement of the law.[25] In *Wright v. Bartimus Frickleton Robertson & Gorny PC*, 364 S.W.3d 558, 566–67 (Mo. App. W.D. 2011), this Court explicitly held that under § 484.130 a valid attorney's lien on any

---

[24] § 484.130 states, in pertinent part: "From the commencement of an action or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action…" § 484.140 states, in pertinent part:

> [U]pon notice in writing by the attorney who has made such [a contingent fee] agreement with his client, served upon the defendant or defendants, or proposed defendant or defendants, that he has such an agreement with his client, stating therein the interest he has in such claim or cause of action, then said agreement shall operate from the date of the service of said notice as a lien upon the claim or cause of action, and upon the proceeds of any settlement thereof for such attorney's portion or percentage thereof….

[25] As the trial court properly noted in its amended judgment: "There is no language within either statute that prohibits an attorney in contingency fee matters from attaching a lien under Section 484 130. There is no statutory language that makes Section 484140 the exclusive means to perfect a lien in a contingency matter."

35

settlement or judgment of a claim is established against a third party defendant when the attorney files the suit at issue.

> Under section 484.130, an attorney's lien automatically attaches "from the commencement of an action or the service of an answer containing a counterclaim. "No notice of ... [a section 484.130] lien [is] necessary after suit [is] filed, and summons served" if the attorney claiming the lien brought the suit and appeared in the case." The filing of the suit is all the notice required. Once a section 484.130 lien attaches, a defendant who thereafter settles with a plaintiff without addressing the lien or otherwise securing its release does so at his peril.

*Id*. (internal citations omitted) (quoting *Downs v. Hodge,* 413 S.W.2d 519, 523 (Mo. App. 1967)). The Court in *Wright* specifically noted that § 484.140 provided an additional means of asserting a lien. *Id*. at 566 n.8.

Unfortunately, while the trial court properly recognized its error in submitting the question of whether a lien existed to the jury, its attempt to address that issue was not procedurally proper for the reasons we have noted above. Furthermore, while we agree that under § 484.130 the question of whether a lien existed was not at issue based on the findings in the case and should not have been presented to the jury, it is not clear that the amount of that lien could not have been a valid factual issue.[26] This question is not properly before us on appeal and we make no specific holding regarding this issue. Instead, we merely note that, based on the facts before us, the presence of an attorney's lien under § 484.130 does not necessarily establish that the amount paid to Mayer was all subject to a lien. The amended judgment entered against Franklin is reversed and remanded for further proceedings consistent with this opinion.

---

[26] The contingency fee contract between Mayer, Chad and Tiffany was entered into evidence over the objection of the Heckadons. There were questions at trial regarding whether this document was a valid contingency agreement which are not raised on appeal and which we do not decide now.

**IV. Motion for Attorney's Fees on Appeal**

The Heckadons submitted a motion requesting attorney's fees on appeal, as permitted by Missouri Court of Appeals, Western District Special Rule 29. We follow the "American Rule," which provides that "orders requiring one party to pay another party's attorney's fees or other expenses ordinarily are not permitted unless the parties' contract or a statute authorizes the court to make such an award." *Birdsong v. Children's Div., Mo. Dep't of Soc. Servs.*, 461 S.W.3d 454, 459 (Mo. App. W.D. 2015) (internal citation and quotations omitted). The entirety of the Heckadons' argument that they are entitled to attorney's fees in spite of that rule is a general citation to this Court's rule and *Volk Const. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897 (Mo. App. E.D. 2001). That case upheld the grant of attorney's fees by a circuit court where it found the "award of attorney's fees [was] justified under the 'special circumstances' exception to the American Rule, which includes situations where a party is shown to have engaged in intentional misconduct." *Id*. at 901.

While elements of intentional misconduct were found due to the default judgment in the instant case, because all parties had valid grounds for an appeal, we decline to award the Heckadons their attorney's fees incurred as a result of this proceeding.

**CONCLUSION**

The judgment entered against Universal on equitable garnishment is reversed.

The summary judgment in favor of Universal on the Heckadons' claims of fraudulent transfer, conspiracy, and interference with a business expectation is affirmed.

The amended judgment entered against Franklin is reversed and remanded for further proceedings consistent with this opinion.

/s/ *Thomas N. Chapman*

Thomas N. Chapman, Judge

All concur.